As explained in Mr. Burgos' briefs, the impoundment and purported inventory search of his truck was unconstitutional for three different reasons, any one of which would require the suppression of the drugs that were found. But this morning I want to focus on the third issue because I think that's the most straightforward one given that it involves applying undisputed law to facts which can't reasonably be disputed. And there are two important legal principles with regard to that issue. The first is that the Fourth Amendment requires inventory searches to be conducted pursuant to standardized criteria. The second point is that an inventory search is constitutionally valid only if an officer with no investigatory motive whatsoever who was following that criteria would have conducted a search no broader than the one at issue. So the question in this case is, if some random sheriff's deputy had pulled over a car because it was a traffic violation and impounded the car because the driver had no license, would that officer have looked at this 12-year-old truck, looked at the dashboard that part of it wasn't flushed and decided to dismantle the dashboard? And I don't think that's the case here. And this question is important because whatever inventory search activity this course endorses in this case would apply across the board to any car that's impounded. So I want to start with the actual impound policy at issue here, which covers closed containers within the vehicle. The government's primary argument is that Deputy Tellez knew that there was a hidden compartment, in other words a closed container, behind the dashboard before he even removed the part of the dashboard covering the radio. And the record simply doesn't support that position. In fact, as I pointed out in the reply brief, the government is making this argument for the first time in their answering brief in this second appeal. At the original evidentiary hearing, the first appeal, and on remand, the government never disputed and at times affirmatively stated that Deputy Tellez first took off the piece of the dashboard and then discovered the hidden compartment. Counsel, I'm looking at ER 151, which is Exhibit 101, Defendant's Exhibit 101, which is this dashboard issue, and I noticed that there's some light colored, looks like some packing around the side. Now is that what Officer Tellez saw or is this a later photo? I don't know. No. This is, I believe at pages 99 to 101, he talked about these photos, and these photos were taken after. So basically, the photo in 152 is the piece that was removed and that piece was over and presumably that white part is the sticky stuff that would have held this piece and part on in addition to the parts that would attach to these holes on the side. So these pictures were not what he saw. These were taken afterwards. In other words, the 152 photo would have been over the 151 photo. Correct. That's the removed piece. It would have been more or less flush to the dash. Correct. And that's the key point I wanted to make here is that this photo, I mean, my point is that Deputy Tellez never said what the government says he said, but even if he did, this photo would show that that was a lie, that this piece cannot be put over that part of the dashboard such that it was attached but not flush, which is Deputy Tellez's words, in any way that somebody could conceivably look at that and say there's a hidden compartment. How could we possibly know that from just looking at these two photos? These two photos putting together with Deputy Tellez's testimony about what he saw. Do we know that this is a manufacturer part? Is this some other jerry-rigged part? It shows that there would be at least two screws down at the bottom. Was it screwed in? Was it taped on? What he said was that it was attached to the dashboard, hanging, but not flush. Okay. So it was secured in some way to the dashboard, but didn't look like what it should have been when it came from the manufacturer. What he said was it didn't look normal. Now I would question, as I pointed out, this is a 12-year-old truck. And the last time I had a car that I kept for 12 years, everything was hanging off. So I think that the idea that not normal is not enough to go start to think about. How did he remove it? Did he just peek under it and then later remove it? And did he see things first? He said he pulled it off. He actually pulled it off? It was hanging and he just pulled it off. It didn't require a screwdriver? No. No. I mean, it was, he says, at page... Responded to touch, did it not? It respond... Well, I mean, when he touched it, he said he could pull it right off, and so it was just... But it was hanging loose. So it wasn't secured at all? Well, it was secured in the sense that it was apparently affixed there until he touched it. It wasn't... Right. But it could have just been... You could have just put a plate on there, but not screwed anything in and not had any Right. But the point is whether or not, not what amount of effort he had to do to look behind the dashboard, but that he shouldn't have been looking at that area in the first place because that's not part of a routine inventory search. How is this different than opening a glove compartment to see if there's something in there? You look at a glove compartment and you know that's a container. There's no question about that. Just like with this container policy that the Sheriff's Department has, let's say there's a Tupperware container in the back seat. You look at that, you know it's a container. You don't think that removing a dash and creating a compartment in the blank space could be a container? I think we know now that it's a container. No, whether it could be. You know a glove compartment is designed for it, but what if it's a side panel? Well then we get into the cases that I've cited from other circuits, Kennedy, Best, and Lugo, which are the same basic things. There's lots of parts of a car that can be a container, but we don't allow, as part of a routine inventory search, officers to start dismantling the car on the off chance they might find something. What if they don't have to dismantle it? What if it's obvious that the quarter panel or the side panel has been tampered with and therefore is not in alignment, it doesn't look, because they do know, as a matter of experience, you find it at the border all the time, right, the border cases. That's where they're looking to find these drugs. That's where they're looking when they have an investigatory notice. I understand it, it's the border search doctrine, I understand, and they may be trying to extend it to this case, I understand, but I'm just saying, you know, if the idea is it's a container, and it's potentially a container, and it looks as if it's just hanging there, why wouldn't that be enough to justify the lifting it off to see if it actually is a container? Two quick points about that, and I'm running out of time. The first is that unless there's actually the status of what the part is reflects conclusively before you even delve into it, that it's a container, the officer shouldn't take that step because in a case like this, or in the cases from the other districts, the policy itself says you can look at closed containers. So if you don't come under the closed container rule, then you don't even get to that point. The next part is that in a case like this, we don't have any testimony at all saying that an officer without an ulterior motive would have interpreted something like this as a container. And the third part, which comes from Best and Lugo, which is even if we interpret the policy in that way, it's not a valid inventory search goal to search behind there because hidden property like that, an owner would not have any valid claim against the police department for failing to protect such property, and therefore, even if we interpret the policy saying you can generally look there, it's not a valid policy because it just doesn't serve the goals that are the only thing that authorize warrantless inventory searches. You have about half a minute for your rebuttal, counsel. Thank you. We'll hear from the government. Good morning, Your Honors. May it please the Court. Carrie O'Neill on behalf of the United States. I'll address the inventory search first because that's what the defendant chose to focus his time on. Your Honors, the inventory policy here was broad and uncontested. It's in the record at ER 74 and ER 98, and I won't repeat it. I think the record also shows indisputably from Deputy Tellez's 2012 declaration that he perceived the area behind the hanging dashboard to be a container before he removed it, and the language in his declaration is removal. There's nothing about needing to use any additional force, unscrewing anything, or removing adhesive with any additional tools. The officer stated it was immediately apparent that the area around the ashtray and radio was lifted off, and this was not the normal condition. That's at ER 73. The declaration continues, I could see there were objects inside the area, full stop. I removed the hanging part, and I could see brown tape bundles. Now, the defendant argues that the government never construed the declaration in this manner before, but Your Honors, this is the issue of what the record shows, and the record shows from his uncontested and uncontradicted declaration is that he perceived it to be a container that may have had personal objects inside at the time that he inventoried the car. Moreover, the search of this area, which he perceived to be a container, clearly furthered the purposes of an inventory search. The inventory search. What is it that justifies him concluding that this could be a container? Because it appeared to him, without touching or removing anything, that there were objects inside. And how could he see inside? I thought it was hanging off. Was it askew? Your Honor, I wasn't the AUSA who prosecuted the case below, so I never saw the car. I know, but we need to know from the record. We've got the same disadvantage you do. Right. And so I think the fact that the district court never made an adverse credibility finding here, the fact that defendant never actually challenged the specific fact that Deputy Tellis was able to see inside. Yeah, we're still trying to figure out. So the deputy says that he can see behind this plate in some way. So whether the part is sitting askew or partially off or something, it's not secured. And it's not just a matter of him saying, this doesn't look affixed, but I can't see what's behind it, so I'm going to pull it off and take a look. Here's what he says, per his declaration. I inspected the front compartment. What plate did it say, Judge? I'm sorry, it's 73. 73? Thank you. As I inspected the front compartment, it was immediately apparent that the area around the ashtray and radio was lifted off. And then he says, this is not a normal condition. And then he says, I could see that there were objects inside the area. I removed the hanging part. So we're supposed to understand that sequence, that he could see before he lifted the cover off, which I take it is a picture, 152, and that he could see into this black space that's below the radio and the other controls on 151. So he could actually see without touching, without removing anything. That's how we're supposed to interpret that statement. Yes, Your Honor. And I think that's how we have to interpret this statement. It's written in a sequential manner. He doesn't say that he had to touch it in order to get that initial sight that there were objects, not even remove it. He doesn't even say, I had to touch it first, then I could see objects inside, then I removed it and confirmed. That's not what he says. He says, it was lifted off. I think from this record, viewing all facts in the light most favorable to the government, which this court has to do in this case, is that he could perceive that this was a container. And I think defendant's argument almost asks this court to hold that because this may have looked suspicious, the officer has to ignore the fact that he perceives it to be a container. But that is not what we need to be asking officers to do. Moreover, the purposes of an inventory search is not only to protect the driver's rights, it's also to guard the police from danger. And mind you, this was a car that wasn't registered to the defendant. So whoever was going to lawfully take possession of the car subsequent to its impoundment needed to be protected from dangerous instrumentalities. And Opperman, South Dakota v. Opperman in footnote 10, made clear that contraband drugs are considered dangerous instrumentalities in the course of an inventory search. So the mere fact that this container that the officer perceived may have been suspicious doesn't mean that then the officer shouldn't look at it. He perceived objects inside. He removed it without any force that's apparent in the record. And that's why the government asked this court to rely on United States v. Jackson and hold that it's akin to the loose flap of carpet in that case. And Jackson is important too because it focuses the court's attention on the fact that once you have a standardized police practice, an officer may search those places where under the facts of that particular case, he can reasonably conclude personal property may be located. And that's what we have. And this court doesn't have a rigid requirement that another officer testify, I too would have looked under there. And I think that requirement is one that shouldn't be adopted. And frankly, I think the 8th and 10th circuits got that part of the analysis wrong. It ignores the fact-bound nature of assessing reasonableness in inventory searches. It ignores Bertin's and Wells' reminder that officers have latitude under their policies based on the facts of their search. Your theory is that once he saw anything in there, it was a fair game to lift it up and to check, or he had to make some judgment as to whether it could house what you're now referring to. I thought you were talking about weapons originally, that is, in the briefing. But you're saying dangerous instrumentality is the fact that it's drugs. Contraband drugs, yes, Your Honor. So, once it was off and he could see it was a space, then he could verify what was in there. I believe that's correct, Your Honor. And it is akin to the glove compartment. And perhaps it's even more apparent to him than a glove compartment because it was already lifted off. He could already see inside. The glove compartments are typically closed. So here, he could already see that it was housing some object, and it was a container under the LASD policy at that point. If the Court has further questions on the inventory search? If I may briefly just address the defendant's argument regarding subjective intent rendering the impound unlawful. I think Brigham City v. Stewart from the Supreme Court makes clear that the subjective intent of the officer in this Fourth Amendment analysis is irrelevant. If objectively reasonable circumstances are present, the Fourth Amendment is satisfied. We can't or shouldn't have a subset of different rules or protocols depending on which exception to the warrant requirement we're talking about. So I think under the objectively reasonable circumstances here, whatever suggested investigatory motive the defendant is referencing in his brief is ultimately irrelevant because the impound was objectively reasonable under the community caretaker requirements. Defendant doesn't really dispute that. And it accorded with the LASD impound policy that the government established at the time of the district court's hearing. So basically your argument is you're operating under the community care exception and that the policy gets you over the next hurdle of what the scope of the search is. Well, yes, Your Honor. It has to be a container and the container is a constitutional category that we can honor as a matter of policy. That's correct. The compliance with the standardized policy is a proxy for Fourth Amendment reasonableness and good faith. And here it was met both in regards to the initial impound and in regards to the subsequent inventory. If there are no further questions. Thank you, counsel. Thank you. Mr. Laughlin, you have a little time left. Thank you. Counsel says repeatedly the deputy tell us saw objects inside the radio area before he removed the panel piece. And he simply never said that. And common sense says that if he did see that, he would have said it repeatedly, unequivocally and clearly over and over again. But he didn't. The best case they have is the portion of the declaration read by Judge Fisher. But that can't be read in isolation. I acknowledge that the declaration is ambiguous, but the ambiguity is cleared up by his contemporaneous police report, his DEA interview two months later, and most importantly, his testimony on pages 99 through page 101. He's asked, did you notice at any point closed container in the truck? He said no. He then was asked about the radio. It didn't look normal. That's not the reaction of an officer who said, you know what, as soon as I saw it, I knew it was a container. I knew it had something inside. Well, what do you do with this passage? You heard what Judge Fisher read. In addition, he says, in my experience, it's not a normal condition. I could see that there were objects inside the area. What do you do with that passage? Well, as I said in the opening brief, that passage can be read in one of two ways. Either I saw objects inside because I removed the piece, or I saw objects inside after I removed the piece. That's not the sequence. He said, I saw, and then I removed. That's the declaration. And if that was the only piece of evidence, but I know of no law from this court that says we look at somebody's declaration, we don't look how they were cross-examined. No, I understand that. OK, so I'm looking at ER 99. Yes. You looked at the dashboard, and you say that it was not normal. Yes, sir. So what you did was you pulled off the plastic to the dashboard, right? I removed it. It was already coming off, so I just continued to remove it. It was on the dashboard when you saw it. Yes, sir, you pulled it off. It was not flush against the dashboard. That doesn't clarify whether he could see anything inside. Who was doing the crops? It was a defense counsel. OK, so the defense counsel didn't probe to clarify whether the sequence. Well, I think if you then continue reading to page 100 to 101, he says, you then pulled the plastic off the dashboard, yes. And that's when you start looking at the photos. And exhibit 102 is the area you pulled off, yes. And after you pulled that off, you looked inside, and there was a hidden compartment. Yes. You looked inside the hidden compartment, and there were drugs. Yes. So to me, that says a very clear sequence. I took the part off. I looked inside. I saw drugs. I saw the compartment. Thank you, counsel. The case just argued will be submitted for decision, and the Court will adjourn.
judges: O'scannlain, Fisher, Bybee